**CIVILLE & TANG**
G. PATRICK CIVILLE
JOYCE C.H. TANG
PMB 86, P.O. Box 10003
Saipan, MP 96950-8903
Telephone: 670/235-1725

**COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP**
KEITH F. PARK
PAMELA M. PARKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
  – and –
ALBERT H. MEYERHOFF
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

**ALTSHULER BERZON LLP**
MICHAEL RUBIN
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: 415/421-7151

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| DOES I, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>             Plaintiffs,<br><br>     vs.<br><br>THE GAP, INC., et al.,<br><br>             Defendants. | Case No. CV-01-0031<br><br>CLASS ACTION<br><br>REQUEST FOR PAYMENT OF CLAIMS ADMINISTRATOR'S REMAINING OUTSTANDING INVOICES FOR SETTLEMENT-RELATED FEES AND EXPENSES<br><br>DATE:   December 27, 2007<br>TIME:   9:30 a.m.<br>JUDGE: Alex R. Munson |

Plaintiffs respectfully request that the Court grant the request of the Claims Administrator, Gilardi & Co. LLC ("Gilardi"), for payment of $295,423.44 in expenses and personnel time necessarily and reasonably incurred over the past five years during Gilardi's administration of the complex and challenging settlement of this action. The grounds for this request are fully set forth in the accompanying declarations of Dennis A. Gilardi and Keith F. Park in Support of Request for Payment of Claims Administrator's Remaining Outstanding Invoices for Settlement-Related Fees and Expenses ( respectively, "Gilardi Decl." and "Park Decl."), and the exhibits annexed thereto. Plaintiffs briefly summarize those grounds here.

Gilardi is requesting payment of this amount out of the remaining, undistributed settlement funds – specifically, from the funds that remain in the trust account established by plaintiffs' counsel for this case and which have not yet been transferred to the Garment Oversight Board (the "Board") pursuant to the Court's July 13, 2007 and September 29, 2007 Orders. The amount originally estimated and allocated for claims administration in the settlement agreement – $500,000.00 – has proved insufficient to cover all the substantial and unforeseen expenses incurred by Gilardi during the course of its administration of the global settlement. As detailed in the Park Declaration, the allocated sum already has been spent on a number of other necessary expenses associated with the settlement, including translation costs and the costs of preparing and implementing publication of the notice in several foreign publications, as well as on Gilardi's initial claimant database, notice and claims administration costs. See Park Decl., ¶¶3-5.

The Court is all too familiar with the many challenging and often intractable problems that arose in connection with administrating this unique settlement. These were detailed in reports filed with the Court, and in particular, plaintiffs' July 2004 Report to the Court on the Status of Settlement Administration. There, plaintiffs explained the many complexities of administering a settlement involving over 30,000 potential claimants from 20 countries, who speak at least 7 different languages. It was enormously expensive just to obtain reliable translations of approximately 100,000 pages of documents, including vital Consent to Sue forms relating to the claimants in the class and Fair Labor Standards Act ("FLSA") cases. Gilardi Decl., ¶¶4, 7, 12. Apart from the translation issues, the following problems plagued Gilardi's efforts

- 1 -

to create a thorough and accurate master database of claimant information – a vital component of the ultimate settlement fund distribution to claimants:

- Lost, destroyed, incomplete or illegible garment factory employment records;
- Missing, illegible or incomplete information from claimants;
- Conflicting information provided by claimants and factory employers; and
- Conflicting, questionable or duplicative information provided by claimants.

*See* Gilardi Decl., ¶¶7-9, 12.

The Court's September 2004 Order sought to address these problems by setting forth guidelines for their resolution. The simple reality, however, is that the problems were so extensive that, even with the Court's guidance, resolving them required a time- and labor-intensive review of thousands of individual entries on the claimant database. Gilardi Decl., ¶¶10-12, 14. As Gilardi diligently worked to generate a thorough and accurate database, it also had to contend with the fact that information was continuously being provided for the purpose of updating, supplementing or correcting existing information on potential claimants. Consequently, the master database necessarily underwent constant revision. *See* Gilardi Decl., ¶¶5-6, 11-12, 14.

Because the payments to the class members and FLSA Opt-In Plaintiffs depended in large part on the total number of individuals making claims, Gilardi had to identify and remove not only ineligible claims, but duplicative claims as well. This, too, was not a simple process. For example, workers from China and other countries had very similar names, and Gilardi was required to meticulously sort through the information provided for those individuals – such as employer data, birth dates, Social Security numbers or other employee identification data – to confirm whether particular claims were or were not actually duplicates. Gilardi Decl., ¶12.

In short, it was a herculean task just to create a reliable database from which settlement payments could be calculated and addresses could be gleaned so that checks could be mailed to proper, eligible claimants.

1   Further complicating this process was the fact that the settlement set forth very complex formulas for calculating the payments to eligible claimants. This required Gilardi to develop custom software just for the purpose of making those calculations. Gilardi made numerous "test runs" and audits of the program well before payments were actually calculated, to ensure that the payments made were accurate. Gilardi Decl., ¶ 13. Moreover, Gilardi was responsible for ensuring that all tax liabilities were paid, and worked closely with tax accountants to ensure that tax withholdings were accurate, that sufficient reserves had been set aside to pay any tax penalties, and that refunds were obtained where appropriate. Gilardi Decl., ¶ 15.

Yet, Gilardi's task was not complete once the initial check distribution was accomplished. Almost immediately, Gilardi, plaintiffs' counsel, the factory defendants and the Board began to receive inquiries from current and former garment factory workers. Gilardi was flooded with thousands of inquiries, which needed to be sorted and addressed. Most were from individuals who had never before asserted any claim and who did not appear on the existing database. Many more were from individuals who had not received their checks or who believed they had not received the proper amount of compensation. In addition to organizing and responding to these inquiries, and researching the claims of individuals not currently on the database, Gilardi also took steps to recalculate and/or reissue hundreds of checks using the new information provided. Gilardi Decl., ¶ 17.

Plaintiffs' counsel believe that Gilardi has handled its responsibilities in administering this unique settlement as efficiently and cost-effectively as possible, under challenging and complex circumstances. The total expense of claims administration has exceeded the amount allocated under the settlement because of complex problems (and the magnitude of the expense to resolve them) that could not have been foreseen at the time of the settlement. The amounts for which Gilardi is now seeking payment were, without question, reasonable and necessary for the successful implementation of the settlement, and to ensure that compensation reached as many of the eligible claimants as reasonably and practicably possible. And indeed, Gilardi's efforts, which these expenses reflect, have directly benefited members of the class and the Opt-In Plaintiffs. Gilardi's work has resulted in almost 14,000 claimants receiving more than $2.289 million in compensation. *See* Gilardi Decl. at Exhibit A.

1  In conclusion, Gilardi's request for payment is reasonable and appropriate. In light of the fact that
2  those eligible claimants whom Gilardi identified have already received their payments, and sufficient funds
3  remain with the Board to compensate any other individuals whose claims might later be found to be valid or
4  to require some adjustment, Gilardi's request should be granted and paid out of those funds still held in the
5  trust account.

6  DATED: November 29th, 2007

Respectfully submitted,

**CIVILLE & TANG**
G. PATRICK CIVILLE
JOYCE C.H. TANG

By: _____
         JOYCE C.H. TANG

PMB 86, P.O. Box 10003
Saipan, MP 96950-8903
Telephone: 670/235-1725

**COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP**
KEITH F. PARK
PAMELA M. PARKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

**COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP**
ALBERT H. MEYERHOFF
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

**ALTSHULER BERZON LLP**
MICHAEL RUBIN
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: 415/421-7151

*Attorneys for Plaintiffs*

C:\DOCUME~1\terreed\LOCALS~1\Temp\1c\MetaSave\MIS 00046836.doc

**CIVILLE & TANG**
G. PATRICK CIVILLE
JOYCE C.H. TANG
PMB 86, P.O. Box 10003
Saipan, MP 96950-8903
Telephone: 670/235-1725

**COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP**
KEITH F. PARK
PAMELA M. PARKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
  – and –
ALBERT H. MEYERHOFF
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

**ALTSHULER BERZON LLP**
MICHAEL RUBIN
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: 415/421-7151

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| DOES I, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>THE GAP, INC., et al.,<br><br>                    Defendants. | Case No. CV-01-0031<br><br>CLASS ACTION<br><br>DECLARATION OF KEITH F. PARK IN SUPPORT OF REQUEST FOR PAYMENT OF CLAIMS ADMINISTRATOR'S REMAINING OUTSTANDING INVOICES FOR SETTLEMENT-RELATED FEES AND EXPENSES<br><br>DATE:  December 27, 2007<br>TIME:  9:30 a.m.<br>JUDGE: Alex R. Munson |

I, Keith F. Park, declare as follows:

1. I am an attorney duly licensed by the State of California and am admitted to the Bar of this Court *pro hac vice*. I submit this declaration in support of plaintiffs' counsel's request to allow the payment of Gilardi & Co. LLC's ("Gilardi") remaining invoices for notice and claims administration-related fees and expenses in the amount of $295,423.44 from reserves previously established from the aggregate settlement fund (approximately $20 million plus interest) generated by the settlement of this litigation.

2. I was involved in the negotiations which culminated in the global Settlement Agreement dated as of September 24, 2002, previously approved by the Court. One of the provisions of the Settlement Agreement was the allocation of $500,000.00 for "Administrative Costs," defined in the Settlement Agreement as the "costs incurred by the Claims Administrator, the fees paid to the Claims Administrator, the cost of printing and publishing court-approved notices of settlement, and the costs of mailings to Provisional Class Members, Opt-In Plaintiffs and Settlement Class Members (including the cost of mailing settlement checks to Settlement Class Members) . . . ." Settlement Agreement, ¶12.a. At the time the Settlement Agreement was entered into, the amount allocated for these items was, of necessity, an estimate. The allocation was made at a time when, for example, the following were largely unknown: (i) the exact number or location of current and former garment workers potentially affected by the settlement and thus entitled to notice; (ii) the extent and accuracy of the factories' employment records (the intended foundation of the worker database and claims administration); (iii) an accurate estimate of the costs of the extensive notice-by-publication program that ultimately was put in place; and (iv) the extent and expense of the translation services that were required during the course of claims administration. As a result, the fees and expenses actually incurred have exceeded the initial $500,000.00 allocated.

3. Thus far, Gilardi has been paid a total of $354,267.00 from the settlement's claims administration fund for its notice and other claims-related work on this case. The extensive work (and the unexpected problems faced) by Gilardi are described in the Declaration of Dennis A. Gilardi in Support of Request for Payment of Claims Administrator's Remaining Outstanding Invoices for Settlement-Related Fees and Expenses. Gilardi's efforts need not be recounted here. Suffice it to say that my firm has retained

Gilardi on multiple hundreds of occasions in connection with the notice and claims administration aspect of the settlement of class actions. Gilardi has a well-deserved reputation for diligence and thoroughness which is reflected in the work it has done in this case. I believe that the work done (and hence the amount of the resulting invoices) was reasonable and necessary given the circumstances of this case.

4. Another significant portion of the claims administration fund was used to pay for publication notice. As an important supplement to the notices of the settlement that were mailed directly to potentially eligible claimants or handed out at the factories, the Court required that a "short-form" notice be published in a number of countries where significant numbers of former garment workers lived. These notices were published, pursuant to the Court's direction, twice in newspapers of general circulation in China, Vietnam, Thailand, the Philippines, Bangladesh, Saipan and Korea. The total cost of this publication effort was $151,184.00.

5. Finally, Transperfect Translations ("Transperfect") was used on an ongoing basis initially to translate the mailed notice and summary published notice into multiple languages, including Chinese, Thai, Tagalog and Vietnamese, and thereafter to translate into English the Consent to Sue forms, correspondence, employment and identification information, as well as other documents received from claimants in the course of claims administration, so that this vital information could be used in determining the eligibility of claims, and calculating and distributing the payments. I am informed that Transperfect translated approximately 100,000 pages of documents and, although a bulk or reduced rate was negotiated, the cost was still $76,228.89.[1]

6. As the Court previously has been advised (*see* Exhibit 1 to the Report to Court Regarding Settlement Administration per Court's May 23, 2007 Order, and Request for Reimbursement of Claim

---

[1] As is evident from the foregoing discussion – and as counsel previously detailed in Exhibit A to their June 2007 Report to the Court Regarding Settlement Administration, Per Court's May 27, 2007 Order – the publication, translation and Gilardi expenses paid by plaintiffs' counsel from the settlement fund to date, separate and apart from those that are the subject of this Request, exceeded the initial allocation for claims administration work. Much of the excess portion, however, was covered by interest accrued on the amount allocated for Administrative Costs, and thus is not the subject of this Request. The balance of the excess portion was initially and inadvertently paid out of the general settlement fund, but plaintiffs' counsel have reimbursed that amount to the fund.

1  Administrator's Costs, filed on or about June 8, 2007), prior to the distribution of settlement funds to eligible
2  claimants, a tax reserve in the amount of $340,648.35 was established for potential taxes on the income
3  earned on the settlement fund while it was a Qualified Settlement Fund. (This reserve is distinct and
4  different from the reserve established to account for tax penalties potentially incurred in connection with
5  distributions to claimants.) It now appears that this amount will not be necessary to cover potential taxes on
6  the Qualified Settlement Fund's income. We therefore respectfully request that the Court direct that a
7  portion of this amount be used to pay the outstanding invoices of Gilardi, and the balance transferred
8  promptly to the Garment Oversight Board.
9       I declare under penalty of perjury under the laws of the United States of America that the foregoing
10 is true and correct. Executed this nineteenth day of November, 2007 at San Diego, California.

_____
KEITH F. PARK

26 S:\CasesSD\Marianas\DEC KFP 00047048.doc

- 3 -

| | |
|---|---|
| **CIVILLE & TANG**<br>G. PATRICK CIVILLE<br>JOYCE C.H. TANG<br>PMB 86, P.O. Box 10003<br>Saipan, MP 96950-8903<br>Telephone: 670/235-1725<br><br>**COUGHLIN STOIA GELLER<br>  RUDMAN & ROBBINS LLP**<br>KEITH F. PARK<br>PAMELA M. PARKER<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: 619/231-1058<br>   – and –<br>ALBERT H. MEYERHOFF<br>9601 Wilshire Blvd., Suite 510<br>Los Angeles, CA 90210<br>Telephone: 310/859-3100<br>310/278-2148 (fax)<br><br>*Attorneys for Plaintiffs* | **ALTSHULER BERZON LLP**<br>MICHAEL RUBIN<br>177 Post Street, Suite 300<br>San Francisco, CA 94108<br>Telephone: 415/421-7151 |

UNITED STATES DISTRICT COURT

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| DOES I, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>             Plaintiffs,<br><br>    vs.<br><br>THE GAP, INC., et al.,<br><br>             Defendants. | Case No. CV-01-0031<br><br><u>CLASS ACTION</u><br><br>DECLARATION OF DENNIS A. GILARDI IN SUPPORT OF REQUEST FOR PAYMENT OF CLAIMS ADMINISTRATOR'S REMAINING OUTSTANDING INVOICES FOR SETTLEMENT-RELATED FEES AND EXPENSES<br><br>DATE:  December 27, 2007<br>TIME:   9:30 a.m.<br>JUDGE: Alex R. Munson |

I, Dennis A. Gilardi, declare and state as follows:

1. I am the founder and chief executive officer of Gilardi & Co. LLC ("Gilardi"), located at 3301 Kerner Boulevard, San Rafael, California. My firm was retained to provide services related to the administration of the claims submitted in conjunction with the settlement of the above-captioned matter, as well as to prepare and distribute specific notices to class members and to Opt-In Plaintiffs in the related litigation, *Does I et al. v. Advanced Textile Corp.*, No. 99-0002. I have supervised and overseen all of my firm's activities as it relates to these services. I submit this declaration in support of Gilardi's request for the payment of its outstanding, remaining invoices covering settlement-related fees and expenses. These fees and expenses, when combined with other settlement administration expenses paid to others for translation services or publication of notice, as well as with Gilardi invoices already paid, have exceeded the sum allotted in the settlement agreement for claims administration. This declaration provides the Court with the background and history of my firm's involvement in this case. I have personal knowledge of the matters set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2. Gilardi first began work on the Saipan garment factory litigation in January 2002. Initially, Gilardi was tasked with organization and management of the worker information database in the *Advanced Textile Corp.* action brought under the Fair Labor Standards Act ("FLSA"), and with organizing and implementing the initial mailing of so-called *Hoffman-LaRoche* notices in that action. This database later became the foundation for the master database used to distribute payments under the September 2002 global settlement of the related Saipan garment factory cases. The Consent to Sue forms ("Consent Forms") returned by Opt-In Plaintiffs also were used to identify claimants eligible for payment under the FLSA portion of the global settlement.

3. Gilardi was appointed in October 2002 as the settlement claims administrator for the Saipan litigation upon the Court's preliminary approval of the global settlement. At that time, Gilardi was charged with accomplishing the following tasks: (a) updating the database of Opt-In Plaintiffs already created in the *Advanced Textile Corp.* action; (b) creation of a master database of all individuals potentially entitled to payments under the global settlement, including all Provisional Class Members and Opt-In Plaintiffs;

- 1 -

1  (c) coordination and mailing of notice and Consent Forms to additional Opt-In Plaintiffs; (d) coordination
2  and mailing of notice to class members; (e) calculation of the payments to eligible individuals according to
3  the complex formulas established in the settlement; (f) mailing and payment of settlement checks to class
4  members and Opt-In Plaintiffs; (g) responding to inquiries from Opt-In Plaintiffs and class members and
5  related follow-up after the initial distribution of the settlement funds; and (h) other tasks as directed by the
6  Court or the parties.

7      4.    Shortly after preliminary approval of the global settlement, Gilardi began to aggressively
8  administer all aspects of the settlement. Initially, Gilardi prepared notices and Consent Forms for mailing to
9  Provisional Class Members and Opt-In Plaintiffs. Information received from the garment factory defendants
10 was used to update the existing FLSA database. This task was particularly challenging, inasmuch as persons
11 potentially eligible for payment lived in many different countries and spoke many different languages.
12 Notices and forms had to be prepared in seven different languages. Although other entities were responsible
13 for the translation of the notices and forms, Gilardi was responsible for formatting the notices, and ensuring
14 that the most complete and accurate name and address information was used for the mailing.

15     5.    In early 2003, the Court, plaintiffs' counsel and Gilardi began receiving executed Consent
16 Forms from Opt-In Plaintiffs, and information about Provisional Class Members. In an effort to utilize the
17 funds allocated for claims administration in the most efficient and cost-effective manner possible, the
18 decision was made that plaintiffs' counsel would create the initial databases of class member and Opt-In
19 Plaintiff information, based on information received from the factories and the claimants themselves.
20 However, Gilardi received most of the information in the first instance and was principally responsible for
21 opening returned Consent Forms, sorting them into different languages, assigning Bates stamp numbers to
22 each Consent Form, copying the returned Consent Forms and converting them into a PDF document.
23 Gilardi would then forward the documents and information to counsel for translation and additional
24 processing. During this time, Gilardi also processed undeliverable mail, completed address updates and re-
25 mailed notice and Consent Forms to Provisional Class Members and Opt-In Plaintiffs for whom updated or
26 corrected information had been received.

6.     Gilardi continued this laborious task over the course of several months. Thousands of Consent Forms went through this initial processing and Gilardi passed on voluminous information and documents to counsel. Through the collaborative efforts of plaintiffs' counsel, the translators and Gilardi, a series of databases were generated – essentially, one for each garment factory. These databases contained information regarding tens of thousands of workers from different countries who had filed Consent Forms or otherwise were potentially qualified to receive a portion of the settlement proceeds designated as compensation for garment workers. It was imperative that the information contained in the databases be as complete and accurate as possible, because Gilardi would be using them to generate the master database from which eligible class members and Opt-In Plaintiffs would be identified, and their payments under the settlement would be calculated.

7.     By the spring of 2004, however, the true extent of the complexities of the process at hand became apparent. In attempting to generate complete and accurate databases, Gilardi and plaintiffs' counsel were confronted with multiple and significant problems. The pertinent information, in most cases, had been received from the claimants themselves, family members, friends or the factory defendants. The information received from the workers or their friends and family members was often incomplete (erroneous or missing employment data, inaccurate addresses, missing names), conflicting and sometimes of questionable veracity. It was common for Gilardi to find multiple claims filed for the same individual. Moreover, in almost all cases, the information submitted by these individuals needed to be translated. The translation process proved difficult, time-consuming and laborious. The handwriting was often illegible and the forms incomplete in some fashion. While the translations themselves were done by an outside service, Gilardi coordinated the translation of documents in many languages; including, among others, Bengali, Chinese, Korean, Tagalong, Thai and Vietnamese, received from more than 20 countries.

8.     The information received from the garment factories presented similar problems. Notwithstanding these entities' best efforts – including checking and rechecking their records, and constant updating – the databases provided by the factories were often incomplete or erroneous. In many instances, this information lacked current addresses or precise employment dates. After reviewing their records

multiple times, Gilardi concluded the factories sometimes had produced information that conflicted with the original information they previously provided. Gilardi went to great (and time-consuming) lengths to reconcile the conflicting data provided by the various factories.

9. When Gilardi received information from multiple sources about the same individual, Gilardi compared the data. It was common for the information provided by the individuals to conflict with the data provided by their factory employers. Even after Gilardi attempted to synthesize the information, it was still often left with incomplete or questionable data. Due to the inconsistency of the information collected, Gilardi and plaintiffs' counsel determined that they should obtain direction from the Court in dealing with these matters.

10. On September 9, 2004, the Court addressed these issues in an Order Regarding Plaintiff's Report to Court on Status of Settlement Administration ("Order"). In that Order, the Court established specific guidelines Gilardi should follow in the administration of this matter. The Court sought to balance "the need for fairness and consideration of the circumstances of the Settlement Class Members and Opt-In Plaintiffs, and on the other hand, the reality that there is a fixed pool of funds available for distribution, such that any decision concerning payment to a potentially eligible individual necessarily affect the amount of funds available for others." Order at 2. The September 2004 Order approved Gilardi's recommendations for handling the specific problems that had plagued the administration of this matter and provided guidance for responding to the problems associated with missing or incomplete dates of employment, overlapping employers and/or employment periods, illegible names addresses or other information, missing or incomplete addresses, and duplicative or questionable information. The criteria set out by the Order for processing claims going forward left Gilardi with clear and specific guidelines, and was greatly appreciated. That being said, this guidance also set out multiple tasks not originally contemplated by the parties at the time they entered into the settlement.

11. Over the course of the next year and a half, Gilardi implemented the instructions given to them by the Court. To that end, Gilardi generated a new, master database from the multiple databases created by plaintiffs' counsel using the guidelines provided by the Court. Gilardi continued to receive and

process claimant information, sorted, Bates stamped and organized that information, saw to its translation, and added it as appropriate to the database. Gilardi also continued to receive Consent Forms, even though the deadline for their submission had passed. Gilardi worked with plaintiffs' counsel to determine whether these individuals would be eligible for FLSA-related payments, or whether they would be placed in a separate database for untimely Consent Forms.

12.     The tasks performed by Gilardi during this period were complicated by the same types of problems that previously had been encountered. Gilardi employees attempted to find accurate addresses for class members or Opt-In Plaintiffs for whom only incomplete or inaccurate information had been provided. It was continually necessary to process the numerous address updates and other supplemental information forwarded by class members and counsel, and thus, the master database underwent constant revision. Gilardi also went to great lengths to identify and exclude duplicate and/or questionable claims, in accordance with the guidelines laid out by the Court. It is important to bear in mind that, as complicated as this process would be in a large and complex case involving an American class, it was many times more so here by virtue of the sheer amount of information received – approximately 100,000 pages of documents – and the fact that it involved multiple foreign languages relating to some 30,000 individuals. Of particular concern in this effort was the fact that many claimants had identical or very similar names. Great care had to be taken to sort through and compare the available identifying information about these claimants to ensure that names were not inadvertently deleted as duplicates.

13.     Once the bulk of the processing had been completed, Gilardi turned its attention to calculating payments to class members and Opt-In Plaintiffs. Early in the administration process, Gilardi recognized that, given the complexity of the payment formulas set out in the settlement, as well as the numbers of class members involved and their varied employment histories, it was necessary to develop a custom software program to ensure that an accurate and consistent methodology was applied to the calculation of payments for all potential claimants. Gilardi personnel worked on this software over the course of six months, making numerous test runs to ensure its reliability.